## UNITED STATES v. PHILADELPHIA & R. RY. CO.

(District Court, E. D. Pennsylvania. May 26, 1916.)

### No. 18.

1. COMMERCE ☞33—"INTERSTATE COMMERCE"—WHAT CONSTITUTES.
   The essential character of the commerce and the real and ultimate destination of the shipment, and not the billing, determines whether it is "interstate commerce."
   [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 81; Dec. Dig. ☞33.
   For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. CARRIERS ☞38—INTERSTATE CARRIERS—OFFENSES.
   An indictment, charging that the defendant carrier participated in the interstate transportation of coal over a route partly by rail and partly by water without having filed with the Interstate Commerce Commission tariffs for the rate of water transportation, averred that a shipment of coal from a point in Pennsylvania to a port in that state was from thence shipped by water to a point in a foreign state. The indictment further averred that defendant owned the railroad and the barge line by means of which the coal was transported. It was averred that the coal was rebilled at the port to the point of ultimate destination, but no consignor or consignee at that point was stated. Held that, while the mere billing would not determine the character of the shipment, yet the indictment was insufficient to show an interstate shipment of coal over a route partly on land and partly by water; for, there being no averments showing that there were not two separate shipments, the original shipment between the two points in Pennsylvania may be taken as an intrastate shipment.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. ☞38.]

3. CARRIERS ☞38—CARRIAGE OF GOODS—DISCRIMINATION—INDICTMENT.
   An indictment charged that defendant, which operated a line of railroad and a barge line by means of which coal was carried from Pennsylvania to adjoining states, gave special privileges to a particular shipper

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of anthracite coal, in that the rates for the barge line transportation of anthracite coal had been fixed and unchanged for more than five years, while the rates for the transportation of bituminous coal had been subject to frequent fluctuation; that other coal shippers than the one favored were required to make special arrangements as to each shipment; that the favored shipper was given facilities for securing information concerning shipments of coal by other shippers; and that such shipper was also favored in the assignment of barges and barge space. Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380, as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 (Comp. St. 1913, § 8569), declares that no carrier shall engage or participate in the transportation of property unless the rates have been filed and published, nor shall it extend to any shipper or person any privileges or facilities except such as are specified in the tariffs. *Held*, that the indictment was insufficient to charge a discrimination, not showing the filing of tariffs or why the rates for shipments of anthracite coal should not have been stationary while those for shipments of bituminous coal fluctuated.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. ⊜⇒38.]

4. CARRIERS ⊜⇒38—CARRIAGE OF GOODS—DISCRIMINATION—INDICTMENT—CONCLUSIONS.

In such case, the indictment is insufficient to charge any offense with respect to assigning barge space or divulging information to the favored shipper; there being no averments of facts in respect thereto.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. ⊜⇒38.]

At Law. Indictments against the Philadelphia & Reading Railway Company for offenses in connection with interstate carriage. On demurrer to indictments. Demurrers sustained.

Alexander H. Elder, Sp. Asst. U. S. Atty., of Washington, D. C., Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia, Pa.

Wm. Clarke Mason and Charles Heebner, both of Philadelphia, Pa., for defendant.

THOMPSON, District Judge. Indictment No. 18 contains 60 counts. Fifty-nine counts charge the defendant as a common carrier with engaging and participating in interstate transportation of anthracite coal over a route partly by rail and partly by water without having filed with the Interstate Commerce Commission tariffs showing the rates for the water transportation, and are practically identical in form and substance, except for the changes necessary to identify a different shipment under each count. The sixtieth count charges the defendant with extending to a shipper privileges and facilities in interstate transportation not specified in tariffs filed.

The first count charges:

(1) That the defendant from Otcober 1, 1913, to March 25, 1915, was a common carrier engaged in the transportation of anthracite coal shipped from divers mines via St. Clair and Schuylkill Haven, Pa., wholly by railroad and waybilled and transported from St. Clair and Schuylkill Haven to Port Richmond Piers, Philadelphia, Pa., another point on its route, where it connected with a barge line known as the Philadelphia & Reading Transportation Line.

(2) That the name "Philadelphia & Reading Transportation Line" is applied to a line of barges and tugs operated by the defendant, and that, through the instrumentality of the barge line, the defendant was engaged in the transportation of anthracite coal by water from Port Richmond Piers, Philadelphia, to New England points, including East Cambridge, Mass.

(3) That during the said period the defendant was also engaged in the transportation partly by rail and partly by water in interstate commerce under a common control, management, and arrangement for the continuous carriage and shipment of anthracite coal waybilled and transported from St. Clair and Schuylkill Haven to Port Richmond Piers, Philadelphia, by rail, and thence transported to East Cambridge and other New England points through the instrumentality and by the means of the transportation line by water, and that so it had established during the said period through routes for the transportation of property in interstate commerce partly by rail and partly by water under a common control, management, or arrangement for a continuous carriage and shipment from St. Clair and Schuylkill Haven, Pa., to East Cambridge, Mass.

(4) That on December 3, 1913, the defendant engaged and participated in transportation as defined by the act to regulate commerce under a common control, management, and arrangement for a continuous carriage and shipment partly by rail and partly by water from St. Clair to East Cambridge of a carload of anthracite coal, which had been transported by the defendant from St. Clair to Port Richmond Piers, Philadelphia, in a railway car initialed "P. & R." and numbered "31719," and was at Port Richmond Piers, Philadelphia, dumped by the defendant from the said car into a barge known as the "Coleraine," by transporting the coal in the said barge over its water route from Port Richmond Piers to East Cambridge at some rate and charge, the amount of which is to the grand jury unknown, and this without the rate and charge or any rate and charge for the water transportation service having been filed with the Interstate Commerce Commission, that is to say, without the defendant or any other person or corporation having filed with the commission any schedules showing any separately established rate or charge, any joint rate or charge, or any evidence of concurrence by the defendant in or acceptance of any rate or charge applicable, or, by the defendant applied jointly, to such rail and water transportation, or separately to such water part of such through transportation of the property by means of the barge line. That the property then and there was anthracite coal consigned by the Philadelphia & Reading Coal & Iron Company to Metropolitan Coal Company at East Cambridge.

The defendant demurs for the following reasons:

(a) Because it is not averred in the indictment that the carload of coal in question was consigned at the point of origin as a continuous shipment for continuous carriage over a through route partly by rail and partly by water to the point of destination at the terminus of the water part of the transportation, but it is averred, on the contrary, that the carload of coal was waybilled from St. Clair, Pa., to Port Richmond

Piers, Pa., and there is no averment that it was waybilled from St. Clair to East Cambridge.

(b) That there is no averment that the carload in question moved either as a continuous shipment or on a through consignment over ,a through route at the direction of the consignor or consignee by rail to Port Richmond Piers, and thence to East Cambridge by means of the barge line operated by the defendant, and without passing into the possession or custody of either the consignor or consignee at Port Richmond Piers, the point of transshipment.

(c) That it is not averred in the indictment that the question whether the defendant should file tariffs for the barge line rates has been submitted to and passed upon by the Interstate Commerce Commission.

[1, 2] The question is whether the pleader has set out in the indictment, with certainty and particularity, all of the essential facts which it would be necessary to prove in order to convict. In testing the sufficiency, certainty, and particularity with which it is undertaken to charge an offense, the pleader cannot be helped by implication or intendment.

It is alleged that during the period in question the defendant was engaged in the transportation of anthracite coal partly by rail and partly by water in interstate commerce under a common control, management, and arrangement for continuous carriage and shipment of coal waybilled and transported from St. Clair to Port Richmond Piers by rail, and thence transported to East Cambridge through the instrumentality and by means of the barge line, and so had established through routes for such transportation.

The fact that the defendant was a carrier in interstate commerce over through routes part rail and part water is not sufficient to establish the fact that the certain carloads involved in this indictment were carried in interstate commerce. If, for instance, a shipment were made over the defendant's road from the coal regions in Pennsylvania to a point in New Jersey to a certain consignee, and that consignee, after delivery, reshipped from the point in New Jersey to another point in New Jersey under a new consignment to a different consignee, the interstate through rate from the coal regions in Pennsylvania to the second point in New Jersey would not apply, but the intrastate rate would apply from the first to the second point in New Jersey. Gulf Colorado & Santa Fé Ry. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540; Chicago, Milwaukee & St. Paul Ry. Co. v. Iowa, 233 U. S. 334, 34 Sup. Ct. 592, 58 L. Ed. 988; Pennsylvania R. Co. v. Mitchell Coal & Coke Co., 238 U. S. 251, 35 Sup. Ct. 787, 59 L. Ed. 1293.

The facts and circumstances set out applying to the specific shipments under each count must be examined to determine whether an interstate shipment is sufficiently stated. First, billing and transportation from St. Clair to Port Richmond Piers are alleged as the circumstances of the rail part of the carriage. No consignor from St. Clair or consignee at Port Richmond Piers is mentioned. It is not alleged. however, that there was any billing from Port Richmond Piers to East Cambridge, but merely that the coal was thence—that is, from

Port Richmond Piers, Philadelphia—transported by means of the barge line to East Cambridge. It is alleged that the property was anthracite coal consigned by the Philadelphia & Reading Coal & Iron Company to the Metropolitan Coal Company at East Cambridge, but it is not alleged from what point it was consigned by the Coal & Iron Company, and neither the consignor nor the consignee for the rail transportation is connected by any allegation in the indictment with the Philadelphia & Reading Coal & Iron Company, consignor from an unnamed point to East Cambridge. To summarize the specific facts as to this shipment, the coal was waybilled and transported by rail from St. Clair to Philadelphia. It was transported by water to East Cambridge by means of the barge line, and it was coal consigned by the Philadelphia & Reading Coal & Iron Company to Metropolitan Coal Company at East Cambridge.

From the indictment, therefore, it appears that the shipment from St. Clair to Port Richmond was an intrastate shipment by an unnamed consignor to an unnamed consignee, and the shipment from Port Richmond Piers to East Cambridge was a shipment entirely by water, and the two shipments, representing respectively the rail and water parts of the transportation, had no relation or connection through billing, consignment, ownership, possession, or control of the coal or otherwise, but only through the physical fact that the same coal which started from St. Clair was transported by rail and water to East Cambridge. It was urged by counsel for the government at the argument that the question of interstate shipment cannot be determined merely by billing. That is undoubtedly correct.

"The essential character of the commerce, not its mere accidents, should determine," says the Supreme Court in the case of Texas & New Orleans Railroad Co. v. Sabine Tram Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442. The question is: What is the real and ultimate destination of the shipment? But there must be some fact or circumstance to show that. There is nothing in the allegations of facts and circumstances in the present case to show that when the shipment left St. Clair its ultimate destination by direction of the consignor, or by any of the practices which prevail in shipment of merchandise, was East Cambridge. For all that appears in the indictment, the original consignee received delivery at the terminus of the rail part of the shipment, and the water part of the journey constituted a new and independent shipment. Gulf, Colorado & Santa Fé R. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540; Chicago, Milwaukee & St. Paul Ry. Co. v. Iowa, 233 U. S. 334, 34 Sup. Ct. 592, 58 L. Ed. 988.

Therefore, while it may be sufficiently alleged that the defendant was, during the period covered by these counts, engaged in transportation by a continuous route partly by rail and partly by water from Schuylkill Haven or St. Clair to East Cambridge, the allegations in relation to the specific carload of coal described in any count do not sufficiently state as to it transportation and shipment which would come within the provisions of the act, relating to continuous carriage partly by rail and partly by water under a common control, manage-

ment, and arrangement, requiring a rate for the water transportation of the shipment to be filed with the commission.

[3, 4] The sixtieth count, after charging that the defendant, under the circumstances and conditions set forth in paragraphs 1, 2, and 3 of the first count, and during the period of time mentioned in count 1, engaged and participated in transportation of anthracite coal which had been shipped by the Philadelphia & Reading Coal & Iron Company from numerous mines and was waybilled and transported by the defendant from St. Clair and Schuylkill Haven to Port Richmond Piers and dumped at Port Richmond Piers by the defendant into barges, the railway and barges being operated by the defendant under a common control, management, and arrangement for continuous carriage and shipment, partly by rail and partly by water, from St. Clair and Schuylkill Haven to the respective destinations in the states of Massachusetts and Maine, the said coal being thus transported in the said barges by the defendant over its water route from Port Richmond Piers to the destinations in Massachusetts and Maine, at some rate and charge, the amount of which is to the grand inquest unknown, alleges that the Reading Company owned substantially all of the stock of the defendant and of the Philadelphia & Reading Coal & Iron Company; that the Philadelphia & Reading Coal & Iron Company was engaged in shipping and selling anthracite and bituminous coal; that nearly all the anthracite coal carried in the barge line was shipped by the Philadelphia & Reading Coal & Iron Company, and nearly all the bituminous coal was shipped by shippers other than the Coal & Iron Company.

The bill then charges extension of privileges, not named in defendant's tariffs, to the Coal & Iron Company. It is then alleged: (1) That the rates for the barge line transportation of anthracite coal enjoyed by the Coal & Iron Company have been fixed and unchanging for more than five years, while the rates applying to the barge line transportation of bituminous coal have been subject to frequent fluctuation and have, at most times, been higher than those concurrently applying on anthracite shipments per ton. (2) That while the defendant has required coal shippers other than the Coal & Iron Company to make a special arrangement as to rates for each lot of coal shipped on the barge line, no special arrangements as to rates were required to be made by the Coal & Iron Company as to each lot of coal so shipped. (3) That it has been the practice of the defendant to give to the Coal & Iron Company, and not to other shippers, privileges and facilities for securing information concerning the shipments of coal by the barge line by other shippers. (4) That the defendant has accorded to the Philadelphia & Reading Coal & Iron Company privileges not enjoyed by other coal shippers in the assignment of barges and barge space in connection with transportation over the routes aforesaid. By these practices, the defendant is charged with having extended to the Coal & Iron Company privileges and facilities in the transportation of property which were not specified in its lawfully established tariffs.

The count is drawn under section 6 of the Act to Regulate Commerce, as amended, which provides that:

"No carrier  *  *  *  shall engage or participate in the transportation of *  *  *  property,  *  *  *  unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act;  *  *  *  nor extend to any shipper or person any privileges or facilities, in the transportation of passengers or property, except such as are specified in such tariffs." Comp. St. 1913, § 8569.

It is difficult to perceive how these allegations can be held to state a charge of extending privileges not specified in the tariffs filed. It is not alleged that any tariffs were filed. In describing the first privilege extended, no facts are set out from which a court and jury could determine whether there should have been a change during the five years in rates upon anthracite coal, or that there should not have been constant fluctuations in the rates upon bituminous shipments. It is not alleged as to the second privilege what facilities were given, or what information concerning the shipments of coal was given, nor what bearing the facilities and information referred to have upon the transportation of property in interstate commerce. There is no allegation concerning the third privilege as to what the special arrangement as to rates consisted of, nor to what connection such arrangement had with transportation in interstate commerce. There is no allegation concerning the fourth privilege as to what privileges the defendant has accorded the Coal & Iron Company not enjoyed by other coal shippers in the assignment of barges and barge space in connection with transportation.

The defendant is entitled to some certain and definite information as to what charges it is to meet upon a trial before it can be required to plead to an indictment. It is not even informed of the time when the practices are alleged to have been carried on, except that it was during a period of five years. The allegations are so lacking in certainty and particularity that the count cannot be sustained.

The effect of charges of this sort in criminal prosecutions would be to submit to a jury the determination of the question of comparison of rates upon shipments of anthracite coal with those of bituminous coal, and to permit it to pass upon questions of reasonableness of rates and all the circumstances affecting differences in rates and practices at different periods of time and under different circumstances not covered by any tariff. It is doubtful whether these questions are not primarily for the determination of the Interstate Commerce Commission, rather than for the determination of a common-law jury in a criminal trial. United States v. P. & A. Railway & Navigation Co., 228 U. S. 87, 33 Sup. Ct. 443, 57 L. Ed. 742; Minnesota Rate Case, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1151, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Loomis v. Lehigh Valley R. Co., 240 U. S. 43, 36 Sup. Ct. 228, 60 L. Ed. ——, opinion by Mr. Justice McReynolds, January 24, 1916.

As it is held, however, that the indictment does not, in any of its counts, with sufficient certainty and particularity set out the offenses which it has been attempted to charge, the determination of other questions raised is not necessary.

Upon the other grounds stated, the demurrer is sustained.